**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**PORTLAND DIVISION**

| | |
|---|---|
| DOUGLAS ALLEN ASHCROFT, ) | |
| ) | |
| Plaintiff, ) | **No. 02:12-cv-02275-HU** |
| ) | |
| vs. ) | |
| ) | |
| JERIAL HARTMAN, in his Personal/ ) | **OPINION AND ORDER ON** |
| Individual Capacity, ) | **MOTION FOR SUMMARY JUDGMENT** |
| ) | |
| Defendant. ) | |

_____

Douglas Allen Ashcroft
Umatilla County Jail
4700 NW Pioneer Place
Pendleton, OR 97801

    Plaintiff appearing *pro se*

Ellen F. Rosenblum
Attorney General
Andrew D. Hallman
Assistant Attorney General
Department of Justice
1162 Court Street, NE
Salem, OR 97301-4096

    Attorneys for Defendant

1 - OPINION AND ORDER

HUBEL, Magistrate Judge:

The plaintiff Douglas Allen Ashcroft brings this civil rights action against the defendant Jerial Hartman, a Correctional Officer with the Oregon Department of Corrections ("ODOC"), in Hartman's individual capacity (i.e., not in his official capacity). Ashcroft alleges Hartman used excessive or unnecessary force against him in an incident that occurred on August 31, 2011. Ashcroft, appearing *pro se*, asserts two claims against Hartman: (1) a claim pursuant to 42 U.S.C. § 1983, for "cruel and unusual punishment in violation of the Eighth Amendment and Fourteenth Amendment of the United States Constitution"; and (2) an Oregon common-law claim for assault and battery. *See* Dkt. #54. He seeks compensatory damages of $25,000, and punitive damages consisting of a "$10,000.00 fine," and Hartman's dismissal from his job with the ODOC. *Id.*, p. 6.

The case is before the court on Hartman's motion for summary judgment, Dkt. #84. The motion is fully briefed, and neither party has requested oral argument. The parties have consented to jurisdiction and the entry of final judgment by a United States Magistrate Judge, in accordance with Federal Rule of Civil Procedure 73(b).

### *I. SUMMARY JUDGMENT STANDARDS*

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). In considering a motion for summary judgment, the court "must not weigh the evidence or determine the truth of the matter but only determine whether there is a genuine issue for trial."

2 - OPINION AND ORDER

*Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 800 (9th Cir. 2002) (citing *Abdul-Jabbar v. General Motors Corp.*, 85 F.3d 407, 410 (9th Cir. 1996)).

The Ninth Circuit Court of Appeals has described "the shifting burden of proof governing motions for summary judgment" as follows:

> The moving party initially bears the burden of proving the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case. *Id.* at 325, 106 S. Ct. 2548. Where the moving party meets that burden, the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial. *Id.* at 324, 106 S. Ct. 2548. This burden is not a light one. The non-moving party must show more than the mere existence of a scintilla of evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The non-moving party must do more than show there is some "metaphysical doubt" as to the material facts at issue. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 528 (1986). In fact, the non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor. *Anderson*, 477 U.S. at 252, 106 S. Ct. 2505. In determining whether a jury could reasonably render a verdict in the non-moving party's favor, all justifiable inferences are to be drawn in its favor. *Id.* at 255, 106 S. Ct. 2505.

*In re Oracle Corp. Securities Litigation*, 627 F.3d 376, 387 (9th Cir. 2010).

### *II. SECTION 1983 STANDARDS GENERALLY*

Section 1983 provides, in relevant part, that "[e]very person who, under color of any statute, ordinance, regulation, custom, or

3 - OPINION AND ORDER

usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983.

To establish an individual defendant's personal liability in an action under 42 U.S.C. § 1983, the plaintiff must show that the defendant, "acting under color of state law, caused the deprivation of a federal right." *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S. Ct. 3099, 3105, 87 L. Ed. 2d 114 (1985) (citation omitted). Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred. The first step in any such claim is to identify the specific constitutional right allegedly infringed." *Albright v. Oliver*, 510 U.S. 266, 271, 114 S. Ct. 807, 811-812, 127 L. Ed. 2d 114 (1994) (internal citations and quotation marks omitted).

### *III. STANDARDS FOR EXCESSIVE FORCE CLAIMS*

"When prison officials use excessive force against prisoners, they violate the inmates' Eighth Amendment right to be free from cruel and unusual punishment[.]" *Clement v. Gomez*, 298 F.3d 898, 903 (9th Cir. 2002). However, the use of force does not constitute an Eighth Amendment violation when it is "applied in a good faith effort to maintain or restore discipline [rather than] maliciously and sadistically for the very purpose of causing harm." *Whitley v. Albers*, 475 U.S. 312, 320-21, 106 S. Ct. 1078, 1085, 89 L. Ed. 2d 251 (1986) (citation omitted). Factors relevant to the court's

4 - OPINION AND ORDER

analysis include (1) "the need for the application of force"; (2) "the relationship between the need and the amount of force that was used"; (3) "the extent of injury inflicted"; (4) "the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them"; and (5) "any efforts made to temper the severity of a forceful response." *Whitley*, 475 U.S. at 21, 106 S. Ct. at 1085 (citations omitted). The *Whitley* Court observed that consideration of the first three factors may lead to "inferences . . . as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Id.* (citations omitted).

### *IV. BACKGROUND FACTS*

On August 31, 2011, Ashcroft was incarcerated at the Snake River Correctional Institution, a state prison located in Ontario, Oregon. Hartman was employed at the prison as a Correctional Officer. On the day in question, Hartman was supervising inmates in Unit E of the prison's Intensive Management Unit ("IMU-E"). At about 8:00 a.m., Hartman escorted Ashcroft to the IMU-E recreation yard. When inmates in the IMU are escorted from place to place, they are in restraints, usually metal handcuffs. Some doors, including the doors to the inmates' cells and the door to the recreation area, contain a "cuff port" - an opening through which an inmate can be placed in restraints prior to leaving the area. The usual procedure is for an inmate to back up to the "cuff port," put his hands together, and reach through so the restraints can be

5 - OPINION AND ORDER

applied. The inmate then steps forward, away from the door; the officer steps back, and signals the control center to open the door; the door is opened; and the inmate backs out of the door, where he is patted down for contraband. Then the inmate is escorted to his destination.

Hartman returned to escort Ashcroft back to his cell at about 8:45 a.m. The way Ashcroft relates the facts, he noticed Hartman standing on the other side of the door to the recreation yard, with his back turned. Ashcroft "reached out of the cuff-port door touching [Hartman's] wrist/hand just to get his attention, in a non-aggressive manner." Ashcroft informed Hartman that he was ready, and then "turned around and stuck his hand's [sic] out of the cuff port and submitted to restraint's [sic]." According to Ashcroft, the following events ensued:

> [Hartman][,] upset and aggravated about something including [Ashcroft's] playful touch, waited until the recreation yard door opened [and] then with extreme force and his body slammed [Ashcroft] up against the wall inside the recreation yard. At this point still pinning [Ashcroft] against the wall [Hartman] told [Ashcroft], "don't ever touch me again punk". After that [Hartman] then with force again turned [Ashcroft] around without giving a direct order and began pushing [Ashcroft] while still grabbing a hold [sic] of the handcuff's [sic] toward the exit door of the IMU-E recreation yard. It was at this point [Ashcroft] asked [Hartman] what are you doing this for. At this point [Hartman] rammed [Ashcroft's] face against the exiting doorway of the IMU-E recreation yard. [Ashcroft's] nose and lip were split and swollen, bleeding et cetera.

Amended Complaint, Dkt. #54, ¶ 9.

Ashcroft claims Hartman's use of force was done "without need or provocation," and continued until Ashcroft "suffered physical

6 - OPINION AND ORDER

injury[.]" He claims Hartman's use of force was excessive, malicious, and sadistic. He alleges he suffered "a large bump on [his] head due to the initial ramming into the wall," and after his face was rammed into the door, he "was unable to chew or move [his] mouth without pain for several day's [sic]." MSJ Response, Dkt. #96, pp. 3-4. Ashcroft further claims his arms were scraped when Hartman pulled on Ashcroft's arms, scraping them on the cuff port. *Id.*, p. 4. Ashcroft has submitted nursing progress notes from 9:30 a.m. on the day in question that document dried blood in his right nostril, a swollen nose, and a split and swollen upper lip, with no loose teeth or cuts inside his mouth. An officer, referred to as "Sgt. Brown" in the progress notes, reported that Ashcroft "would not comply [and] was put against the wall." Dkt. #55, p. 5. Ashcroft also has submitted declarations from two inmates who claim to have seen Ashcroft being escorted to the infirmary. Both inmates indicate they observed that Ashcroft's nose and mouth were bloody. Dkt. #97-1, pp. 3 & 5.

Ashcroft further claims Hartman bragged to other inmates about assaulting him. He has submitted three declarations from inmates who claim to have talked with Hartman about the incident. Lee Gordon Lamb indicates Hartman told him, "[Y]eah I beat Ashcrofts' [sic] ass for getting mouthy with me." *Id.*, p. 1. Wayne Kilgore indicates he asked Hartman what happened to Ashcroft, and Hartman replied, "I slammed his punk ass against the wall and doorkey"; "that punk touched me." *Id.*, p. 3. Jack James Hasbrouck states he overheard Ashcroft telling Sgt. Brown he had been assaulted by Hartman. Hasbrouck claims he asked Hartman about the incident, and Hartman replied that Ashcroft "had it coming." *Id.*, p. 5.

7 - OPINION AND ORDER

Hartman denies having a conversation with Lamb, Kilgore, or Hasbrouck about the incident. Not surprisingly, Hartman tells a very different story of the events:

> I opened the cuffport to the recreation yard. Inmate Ashcroft backed up and appeared to submit to restraints under the normal procedure. Inmate Ashcroft should have kept his hands together until restraints could be applied. He did not follow that procedure. Instead, he reached through the cuffport and grabbed my right wrist. I immediately pulled away. I then ordered Inmate Ashcroft to back up and submit to restraints.
> Inmate Ashcroft then stepped forward away from the recreation yard door, and I signaled the control center to open the recreation yard door by waiving [sic] my arm. The recreation yard door then opened, and I had to hold the recreation yard door open so it would not slam shut.
> Once the recreation yard door opened, Inmate Ashcroft charged at me while in restraints. I grabbed Inmate Ashcroft by his upper arm and turned him around, placing him facing forward against the wall of the outside recreation yard. I did this while holding the recreation yard door, and Inmate Ashcroft did not make it out of the recreation yard.
> When I grabbed Inmate Ashcroft, I made a statement to the effect of, "Don't ever reach through the cuffport and grab my wrist again and when you leave the recreation yard, you are supposed to back out." Inmate Ashcroft replied with, "Why don't you do something about it, you punk bitch." I do not recall any additional comments made by either Inmate Ashcroft or myself, although it is possible that something else was said.

Hartman Decl., Dkt. #85, ¶¶ 10-13.

Hartman claims he did not observe any injuries to Ashcroft or any bleeding. He indicates that if there had been noticeable injuries or bleeding, Ashcroft would have been taken for medical treatment immediately. Hartman further claims that about twenty minutes after Ashcroft was returned to his cell, Ashcroft began yelling and throwing objects from his cell, including throwing a

8 - OPINION AND ORDER

drinking cup that hit Hartman in the chest. Hartman issued Ashcroft a misconduct report for violating three Inmate Prohibited Conduct Rules; i.e., Staff Assault, Disrespect I, and Disobedience of an Order I. *Id.*, ¶¶ 14, 17, 18, & 23.

Hartman argues he "used the minimum force necessary to gain control of Inmate Ashcroft after he charged at [Hartman] and Officer Ellestad while in handcuffs. That force was very minimal, and [Hartman] did not observe any injuries to Inmate Ashcroft as a result of that force." *Id.*, ¶ 3. Hartman has submitted the declaration of Officer Brian Ellestad in support of his version of the events. *See* Dkt. #86. Ellestad could not see what happened at the cuff port, but he heard Hartman give a second order to Ashcroft "to back up and submit to restraints." According to Ellestad, it was unusual for an officer to have to give a second such order, and it alerted him to a possible problem with Ashcroft, although he estimates "less than a minute elapsed between Officer Hartman's initial order to submit to restraints and Inmate Ashcroft being placed in restraints." *Id.*, ¶¶ 10 & 11. Ellestad indicates that once the recreation yard door was open, "Ashcroft turned and rushed towards [Hartman and Ellestad], face first. . . . Ashcroft was moving quickly toward us. The intent of his rush was unclear, given that he was in restraints." *Id.*, ¶ 13.

In Ellestad's version of events, Hartman grabbed Ashcroft's upper biceps, and "placed him face-first against the recreation yard door, standing behind [Ashcroft]." *Id.*, ¶ 14. Ellestad indicates he, himself, "restrained Inmate Ashcroft on his right side," placing Ashcroft under the officers' control. *Id.*, ¶ 15. Ellestad heard Hartman giving Ashcroft orders, and he heard

9 - OPINION AND ORDER

Ashcroft shouting in response, but he does not recall what Ashcroft said. In Ellestad's opinion, Hartman "used the minimum force necessary to gain control of Inmate Ashcroft after he charged at us while in handcuffs. That force was very minimal, and I did not observe any injuries to Inmate Ashcroft as a result of that force." *Id.*, ¶ 3.

Ellestad further indicates that after Ashcroft was returned to his cell, he was provided with cleaning items for his cell including "a dustpan, broom, spray bottle, and rags." *Id.*, ¶ 20. A short time later, Ashcroft began "yelling and throwing items out of his cuff port, such as his dust pan, broom, and drinking cup." *Id.*, ¶ 21. Ellestad looked into Ashcroft's cell, and observed a broken broom, "blood spattered on the inside of [Ashcroft's] cell window," and "cuts on Inmate Ashcroft's forearm." *Id.*, ¶ 22. Ellestad speculates that Ashcroft "cut[] himself with the broken broom," and "then spit the blood on to his cell window." *Id.* Ashcroft was placed in restraints, and three officers escorted Ashcroft to "special housing intake" for evaluation by medical staff. *Id.*, ¶ 23.

Ellestad videotaped Ashcroft's escort for medical attention, and the court has reviewed the videotape, Dkt. #86-1, Attachment 2. After Ashcroft arrived in the special housing intake area, an officer asked Ashcroft, at 07:24 on the video, "What's going on?" Ashcroft responded, "I got slammed against the wall by one of your officers." The same officer asked, "Did you not grab his arm?" and Ashcroft responded, "I did not touch that man at all." In addition, the videotape rebuts Hasbrouck's claim that he heard Ashcroft telling Sgt. Brown "that he was assaulted by Officer Jerial

10 - OPINION AND ORDER

Hartman." Dkt. #97-1, p. 5. During the entire trip from Ashcroft's cell to intake, Ashcroft made no such statement.

Ashcroft pursued a grievance against Hartman through the prison's administrative process. After exhausting his administrative remedies without obtaining relief, Ashcroft filed this action.

### *V. DISCUSSION*

#### *A. Eighth Amendment Claim*

With regard to Ashcroft's Eighth Amendment claim, Hartman argues he responded appropriately to what he reasonably perceived to be a threat; that is, Hartman claims Ashcroft "grabbed" him by the wrist. Further, he argues his use of force was minimal, asserting "Ashcroft was not punched, kicked, or taken to the ground," and he simply was returned to his cell. Hartman argues that even if Ashcroft suffered the injuries he claims, those injuries were *de minimis* and do not rise to the level of a constitutional violation. Dkt. #84, pp. 6-7. Hartman cites, *inter alia*, *Wilkins v. Gaddy*, 559 U.S. 34, 37, 130 S. Ct. 1175, 1178, 175 L. Ed. 2d 995 (2010), where the Supreme Court observed that "not every malevolent touch by a prison guard gives rise to a federal cause of action." *Id.* (internal quotation marks, citation omitted).

However, in *Wilkins*, the Supreme Court explained it is not necessary for an inmate to suffer a serious injury in order to sustain an Eighth Amendment challenge:

> "When prison officials maliciously and sadistically use force to cause harm, . . . contemporary standards of decency always are violated . . . whether or not significant injury is evident. Otherwise, the Eighth

11 - OPINION AND ORDER

> Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury." *Hudson [v. McMillian]*, 503 U.S. [1,] 9, 112 S. Ct. 995[, 1000, 117 L. Ed. 2d 156 (1992)]; *see also id.*, at 13-14, 112 S. Ct. [at 1002] (Blackmun, J., concurring in judgment) ("The Court today appropriately puts to rest a seriously misguided view that pain inflicted by an excessive use of force is actionable under the Eighth Amendment only when coupled with 'significant injury,' *e.g.*, injury that requires medical attention or leaves permanent marks").
>
> This is not to say that the "absence of serious injury" is irrelevant to the Eighth Amendment inquiry. *Id.* at 7, 112 S. Ct. [at 999]. "[T]he extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation." *Ibid.* (quoting *Whitley [v. Albers]*, 475 U.S. [312,] 321, 106 S. Ct. 1078[, 1085, 89 L. Ed. 2d 251 (1986)]). The extent of injury may also provide some indication of the amount of force applied.

*Wilkins*, 559 U.S. at 37, 130 S. Ct. at 1178.

The *Wilkins* Court further held that "[t]he Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Id.* at 38, 130 S. Ct. at 1178 (citation omitted). Thus, for example, the Court noted an inmate's complaint of a push-and-shove incident "that causes no discernible injury almost certainly fails to state a valid excessive force claim." *Id.* (citation omitted). Nevertheless, the Court observed that "[i]njury and force . . . are only imperfectly correlated, and it is the latter that ultimately counts. An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to

12 - OPINION AND ORDER

escape without serious injury." *Id.*, 559 U.S. at 38, 130 S. Ct. at 1178-79.

In the present case, Ashcroft claims Hartman gratuitously slammed him into a wall, causing a large bump on his head; slammed his face into a doorway, causing a swollen nose, a split lip, and pain that gave Ashcroft difficulty chewing and moving his mouth for several days; and grabbed Ashcroft by his arms, scraping them against the cuff port, causing abrasions on his arms. Ashcroft further claims Hartman bragged to other inmates about how he had beaten Ashcroft up for "getting mouthy" with him.

Hartman cites several cases, some from this court, in support of his claim that Ashcroft's *injuries* were *de minimis*. *See* Dkt. #84, p. 7. If the facts clearly indicated Hartman's use of force was reasonable and necessary, and represented a good-faith effort to maintain discipline, then the *de minimis* nature of Ashcroft's injuries might carry the day. However, viewing the evidence in the light most favorable to Ashcroft, the court finds Ashcroft has "raised a triable dispute as to whether [Hartman] maliciously and sadistically used force against him." *Dennis v. Nevada*, 579 Fed. Appx. 597, 598 (9th Cir. June 18, 2014) (reversing grant of summary judgment to defendants; relying on *Wilkins*). *See, e.g., Rocheleau v. Hearn*, slip op., 2013 WL 3526758 (D. Or. July 11, 2013) (Brown, J.) (denying summary judgment on similar grounds, holding "Plaintiff has established a genuine dispute of material fact exists as to the degree of force used by Defendant and as to whether Defendant applied force maliciously or sadistically to cause harm rather than in a good-faith effort to restore discipline").

13 - OPINION AND ORDER

1    The court is troubled by inconsistencies in the facts as
2 evidenced by the videotape.  Ashcroft alleges he merely touched
3 Hartman's wrist; Hartman claims Ashcroft grabbed him by the wrist;
4 but on the videotape, Ashcroft claims not to have touched Hartman
5 at all.  Also, Hasbrouck swears he heard Ashcroft telling Sgt.
6 Brown he had been assaulted by Hartman, but the video shows
7 Ashcroft made no such statement at any time during his transport
8 for medical attention.  Nevertheless, as noted above, it is not the
9 court's function, at the summary judgment stage, to "weigh the
10 evidence or determine the truth of the matter but only [to]
11 determine whether there is a genuine issue for trial."  *Playboy*
12 *Enters.*, 279 F.3d at 800.  The court finds Ashcroft has presented
13 enough evidence in support of his allegations to avoid summary
14 judgment.

### *B. State-Law Claims*

17    Hartman argues Ashcroft's state-law assault and battery claims
18 are barred by the Eleventh Amendment.  According to Hartman, the
19 State of Oregon must be substituted as defendant with regard to the
20 state-law claims because, in Oregon, "'the sole cause of action for
21 any tort of officers, employees or agents of a public body acting
22 within the scope of their employment or duties . . . shall be an
23 action against the public body only.'"  Dkt. #84, p. 9 (quoting ORS
24 § 30.265(1)).  Hartman further reasons that once substituted, the
25 State of Oregon must be dismissed because of its immunity from suit
26 under the Eleventh Amendment.
27    Hartman's Eleventh Amendment argument relies on the assertion
28 that Ashcroft is suing Hartman his official capacity.  That is not

14 - OPINION AND ORDER

the case; Ashcroft expressly states he is suing Hartman only in his individual capacity. As a result, the court finds Ashcroft's state-law claims are not barred by the Eleventh Amendment. *See Rocheleau*, 2013 WL 3526758, at *3 (same).

## VI. CONCLUSION

For the reasons discussed above, Hartman's motion for summary judgment (Dkt. #84) is **denied**.

IT IS SO ORDERED.

Dated this 25th day of November, 2014.

/s/ Dennis James Hubel
Dennis James Hubel
Unites States Magistrate Judge

15 - OPINION AND ORDER